**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Reliance Insurance Co., | ) | **CASE NO. 1:01 CV 62** |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Keybank U.S.A., National Association,** | ) | **Order** |
| | ) | |
| **Defendant/Counter-Claimant/** | ) | |
| **Third Party Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Tri-Arc Financial Services, Inc., et al.,** | ) | |
| | ) | |
| **Third Party Defendants.** | ) | |


**INTRODUCTION**

This matter is before the Court upon Swiss Re's Motion for Partial Summary Judgment (Doc. 626).  Also pending is Key's Second Motion for Partial Summary Judgment (Doc. 630).  This case arises out of residual value insurance coverage provided to Key and reinsurance associated with that coverage.  For the reasons that follow, each motion is GRANTED in PART

1

and DENIED in PART.

**FACTS**

This Court has already thoroughly set forth the facts relevant to this matter in the Order resolving the parties' summary judgment motions concerning liability.  The parties now cross move on the issue of damages.  Each opposes the other's motion.  Due to the complex nature of the damages issues raised in the motions, the Court finds that a full recitation of the relevant facts in a separate section would not assist the reader.  As such, the Court will set forth the relevant facts together with its analysis of each issue.

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as

2

> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleadings, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

I.      Contract Interpretation

A.      Early Terminated Leases

Swiss Re argues that Key is not entitled to recover for vehicles sold prior to the termination date set forth in the lease[1].  According to Swiss Re, these vehicles are not covered under the express provisions in the policies.  Key claims that this Court already concluded that early terminated leases are covered.  In addition, Key argues that the policies do not expressly exclude coverage for these vehicles.  Key further claims that, even if the policies do not provide coverage for early terminated leases, Key, Tri-Arc and Reliance specifically agreed to cover early terminations.  Alternatively, Key claims that it is entitled to recover losses incurred on

---

[1]      Although not separately identified, the termination date is
contained in the lease agreement.  The commencement date is
identified along with the term of the lease.  Thus, by performing a
simple calculation, any reader can ascertain the termination date.

3

early terminated leases because Key engaged in this practice in order to mitigate its losses. According to Key, Swiss Re knew Key was mitigating its damages through early terminations and did not object to this practice.  In addition, Key claims that, to the extent its actions removed these vehicles from coverage under the terms of the policies, Key is entitled to recover its losses as compensatory damages.

      1.      Coverage

The following provisions, in relevant part, must be analyzed to determine whether early terminations are covered under the policies[2]:

> "Loss" means... the "aggregate insured residual value" of all "off lease" "enrolled vehicles" minus the cumulative total dollar "market value" for all such "off lease" "enrolled vehicles"
>
> "Off lease" means the "declared termination date" upon which an "enrolled vehicle's" lease is terminated.
>
> "Declared termination date" means  the date...set forth in writing by a legally enforceable "instrument" at the time of enrollment of an "eligible vehicle," exclusive of any extension[s]...."

Swiss Re claims that this language is clear and unambiguous.  According to Swiss Re, in the event Key terminated a lease prior to the date set forth in the lease agreement, any residual value loss on the vehicle is not covered.  Swiss Re claims that by terminating early, the vehicle can never be "off lease."  Because "off lease" incorporates "declared termination date" into its definition, a vehicle can only be "off lease" if the lease is terminated on the date set forth in the lease document itself.[3]

---

[2]      The parties do not dispute that the relevant terms are applicable to all three policies.

[3]      This is exclusive of any extensions, which are not relevant in the context of early terminations.

4

In response, Key claims that Sixth Circuit law requires that insurance policies clearly and unambiguously identify exclusions from coverage.  If resort to complicated semantical analyses is required, coverage cannot be denied.  According to Key, nothing in the language excludes early terminations from coverage.  Key also points to a letter drafted by Swiss Re, which Key claims purports to add a new term to the parties' agreements.  Key claims this new term excludes coverage for early terminations.  Thus, according to Key, by attempting to add the term after-the-fact, Swiss Re admits the exclusion is not present in the policies as drafted.

"The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (*citing Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)).  Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement.  *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999). "[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted." *Id*.  "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).  Under Ohio law, common words appearing in the contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id*.  (internal quotation and citation omitted).  Extrinsic evidence purporting to demonstrate the parties' intent cannot be considered in determining whether a contract is ambiguous.  *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996);

5

*See also Ed Schory & Sons, Inc. v. Society National Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996).

Thus, a court can consider extrinsic evidence only upon a finding that the language is

ambiguous.  Once a finding of ambiguity is made, interpretation of the contract will generally

become a question of fact for the jury.  *Gencorp*, 178 F.3d at 818.

   The law in Ohio regarding exclusions in insurance contracts is well-settled.  "The insurer,

being the one who selects the language in the contract, must be specific in its use; an exclusion

from liability must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos.*, 543

N.E.2d 488, 490 (Ohio 1989) (citing *Am. Fin. Corp. v. Fireman's Fund Ins. Co.*, 239 N.E.2d 33

(Ohio 1968)).  Thus, when "exclusions are introduced into an insurance contract, that which is

not clearly excluded is included." *Johnston v. Akron Ctr. for Reproductive Health, Inc.*, 589

N.E.2d 432, 433 (Ohio App. 9th Dist. 1990).  "Any reasonable interpretation of the policy

resulting in coverage of the insured must be adopted by the trial court in Ohio." *River Services

Co. v. Hartford Accident & Indemnity Co.*, 449 F.Supp. 622, 626 (N.D. Ohio 1977).

   After careful review of the relevant provisions, the Court finds that the policies clearly

and unambiguously do not provide coverage for early terminations.  The definition of loss

includes only those vehicles that are "off lease."  "Off lease" is also a defined term.  A vehicle is

"off lease" on its "declared termination date," which the policies clearly identify as the date set

forth in the initial lease agreement[4] at the time of enrollment.  Thus, if Key permitted a lessee to

terminate the lease early, the vehicle never became off lease because the lease did not reach the

declared termination date.   The Court finds there to be no ambiguity in any of these definitions.

---

   [4]   While the policies allow the "declared termination date" to be set
forth in any legal document, it appears that, as a general matter, the
lease document contained the termination date.

Accordingly, Key's argument is rejected.[5]

Key's argument that the Court already ruled that early terminations are covered is also rejected.  The Court made no such ruling.  As Swiss Re correctly points out, the portion of the opinion relied on by Key addresses only the parties' arguments regarding the statute of frauds.  The Court held that the policy could not be performed in one year's time because the payment provision in the loss section is not triggered until a later point in time, even if Key terminates a lease early.  The parties neither presented, nor did the Court address, whether early terminated leases are covered losses.  The Court finds Key's attempt to extrapolate from one sentence in this Court's order a ruling on this issue to be disingenuous.  In a case with this level of complexity, this Court would certainly not *sua sponte* address a damages issue in the liability phase of this case absent argument from the parties.

Key argues that Tri-Arc, Reliance and Key agreed to cover early terminations during a meeting in late 1999.  At that meeting, these entities discussed various aspects of the claims submission process along with certain coverage issues.  A follow-up email, drafted in a "question and answer" format, was exchanged between Key and Tri-Arc (hereafter "Bacon/Fischer email").  The email contains, in part, the following language,

> [Tri-Arc],
>
> The following is a list of questions we went over together.  Please review the answers and advise of any corrections.  Also[,] you had stated you would forward me a copy of our contract.  It appears no one seems to have it available internally.  I would really appreciate it if you would please forward to me any and all contracts as soon as

---

[5]        Because the Court concludes that the language is clear and unambiguous, Key's extrinsic evidence purporting to demonstrate that the parties subsequently agreed to the exclusion will not be considered.

possible....

[Key]

Questions/Answers

1.What will the time frame be for filing claims?  45 or 60 days from maturity [?]

> 60 days from maturity.

2. What if filed after that will it be declined or charged a depreciation fee?

> A depreciation fee.

3.  How far out can we extend?  6 or 12 months?

> 6 months–need to verify contracts [sic] verbiage.

***

17.  How often is it disbursed?

> Glen is reviewing our current worksheet and will advise.

18.  What is the turn around time to receive claim money?

> The first month will take approximately 35 days until both company's [sic] adjust. The norm should be 30 days.

19.    Is there a [sic] enrollment verification?

> No.

20.    How will they handled [sic] a rejected claim?

> Glen will contact Jennie should he start to see any unfavorable trends.

21.    How are negotiated bids handled?

> Glen was okay with the current authority and negotiated bid guidelines.  We will add a column on the claim spreadsheet to identify this [sic] accounts.

According to Key, this email constitutes a bargained-for agreement.  Swiss Re responds

8

that the policies provide that any changes to coverage must be made by endorsement.  According to Swiss Re, Key's "question and answer" email is not an endorsement and, therefore, coverage cannot be extended to cover early terminations.

Upon review, the Court agrees with Swiss Re.  In support of its position Key cites *Coletta v. Ohio Cas. Ins. Co.*, 121 N.E.2d 148 (Ohio Ct. App. 9th Dist. 1953) and its progeny for the proposition that insurance policies can be modified after issuance even in the face of an "endorsement only" clause.  In *Coletta*, however, the insured paid an additional premium to obtain coverage.  In contrast, Key paid no additional premium to obtain coverage for early terminations.  Key claims that it provided consideration in the form of its "mitigation efforts." There is no indication, however, that the parties to the "modification" contemplated that these "mitigation efforts" constituted bargained for consideration supporting expanded coverage.  In addition, many of the proposed "modifications" have nothing to do with mitigation.  Moreover, the response to one question indicated the "need to verify contracts [sic] verbiage," thus indicating an intent not to amend, but to *comply* with the contract.  Both parties to the Bacon-Fischer email testified that they did not know the terms of the policies, nor understand that they were amending them.  Accordingly, Key's argument that the parties agreed to expand coverage to include early terminations is rejected.

Based on the foregoing, the Court finds that early terminations are not covered under the policies.

2.      Mitigation

Key argues that losses incurred with respect to early terminated leases are covered because, absent Swiss Re's repudiation of coverage, the leases would have continued to term and

9

therefore qualified under the definition of "loss."  In other words, Key claims that it enacted an early termination program in order to mitigate loss.  Key argues that, faced with a denial of coverage, it was entitled to employ whatever techniques reasonably reduced loss without forfeiting coverage.  In response, Swiss Re argues that Key's efforts do not constitute mitigation.  According to Swiss Re, Key cannot be permitted to place itself in a better position as a result of Swiss Re's alleged breach.  Swiss Re claims that Key cannot expand coverage to include vehicles that otherwise fall outside the definition of loss.  Swiss Re does not dispute that Key was entitled to mitigate its damages.  Swiss Re, however, argues that Key should have mitigated its damages within the constraints of the policies.

Under Ohio contract law, parties to a contract are under a duty to mitigate damages in the event of a breach by the other party to the contract.  *Frenchtown Square Partnership v. Lemstone, Inc.*, 791 N.E.2d 417, 419 (Ohio 2003).   Mitigation, also known as the doctrine of avoidable consequences, "is a rule also arising from the cardinal principle that the damage award should put the injured party in as good a position had the contract not been breached at the least cost to the defaulting."  *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.*, 351 N.E.2d 121, 125 (Ohio 1976).  The breaching party, however, is entitled to offset gains earned as a result of conduct unrelated to the breach.  *Airborne Express, Inc. v. Systems Research Labs., Inc.*, 666 N.E.2d 584, 590 (Ohio Ct. App. 12th Dist. 1995).  In essence, the non-breaching party cannot be placed in a better position than it would have been absent the breach.

Upon review, the Court finds that Key is entitled to summary judgment on the issue of whether losses incurred on post-repudiation early terminations may be recovered against Swiss Re as a result of Key's efforts to mitigate losses.  As Key points out, Swiss Re's internal

10

documents indicate that early terminations are "typically beneficial" because the market value of a vehicle is usually greater than its residual value.  In addition, Swiss Re's expert testified that vehicles returned early are likely to have a greater residual value than the projected residual value.

Swiss Re provides no evidence that the residual value loss is not reduced by early terminations.[6]  Rather, Swiss Re claims that early terminations did not reduce Swiss Re's losses because these vehicles are not covered.  Thus, Key's actions actually increased losses to Swiss Re by transferring them from Key to Swiss Re.  As a result, mitigation is not available as a basis for coverage.  This argument misses the mark.  The sole issue before the Court is whether Key reduced losses as a result of Swiss Re's breach and/or repudiation of the policies.  Had Swiss Re not indicated its refusal to provide coverage, Key could not unilaterally decide to terminate leases early in the hopes of reducing Swiss Re's losses.  Once Swiss Re indicated its position that no losses were covered, Key possessed not only the right, but the duty, to take reasonable steps to decrease the losses.

According to Swiss Re, the policies required Key to mitigate losses in any event.  Thus, it appears that Swiss Re claims Key should not have taken any action that would place an otherwise covered lease outside the scope of coverage afforded under the policies.  This argument is simply a regurgitation of Swiss Re's previous argument, i.e., Key cannot take any

---

[6]     A basic example may be helpful to the reader.  Assume the residual value of a vehicle is projected, at lease inception, to be $10,000 at the end of the lease term.  Also assume that, if the vehicle were returned to Key at the end of the lease term, the residual value would be $8,500.  The residual value three months prior to termination, however, is $9,000.  Thus, by terminating the lease early, Key reduced overall losses by $500.

11

action that would cause it to lose coverage.  This Court disagrees.  It would be patently

unreasonable to expect Key to sit idly by and allow Swiss Re's losses to increase dramatically

just to maintain coverage.  Rather, faced with Swiss Re's denial of coverage, the law permits

Key to take any reasonable steps to mitigate losses.  Key offers testimony indicating that, as a

general matter, early terminations reduce losses.  In addition, Key's expert testifies that in this

particular case the use of early terminations reduced Swiss Re's losses by "tens of millions" of

dollars.  Based on this evidence, the Court finds that the use of early terminations was a

reasonable means by which Key actually reduced losses.

Swiss Re correctly argues that Key may not benefit from Swiss Re's breach.  Swiss Re,

however, fails to provide any evidence that Key actually gained any coverage.  Although Swiss

Re  provides evidence that the premiums for residual value coverage are based in part on the

presumption that a certain percentage of leases will be terminated early and, therefore, will not

be entitled to coverage, Swiss Re fails to present any evidence particular to this case.[7]  There is

nothing indicating what percentage of vehicles would have been likely to terminate early absent

Key's actions.  Accordingly, the Court finds that Key did not "gain" as a result of its early

termination program.

Both parties rely on *First Union Corp. v. Gulf Ins. Co.*, 2000 CVS 3558 (N.C. Sup. Ct.

---

[7]     Theoretically Key could have "gained" coverage for the
percentage of leases that would otherwise have terminated early.
If, for example, industry standards suggest that 7% of enrolled
vehicles are typically terminated early, then arguably Key could
not recover for *all* of its early terminations because Key would not
be entitled to "mitigate" a loss that would not otherwise have been
covered.  Swiss Re, however, fails to present any evidence relevant
to this case supporting this theory and, instead, rests with its
argument that *none* of the early terminations are covered.

Div. March 5, 2002) in support of their respective positions.  *First Union* is a case nearly

identical to the present.  The residual value insurance policy at issue contained a provision

prohibiting early terminations and requiring the insured to obtain approval from the insurer prior

to selling a vehicle.  The trial court concluded that the insurer's actions of disclaiming coverage

operated to relieve the insured from the preapproval condition.  In addition, the insured requested

that the trial court grant summary judgment in its favor approving the use of a 180-day early

termination program as an effective way to mitigate losses.  The court declined, finding,

> The Court does not believe summary judgment is appropriate on [the insured's request
>
> for approval of a 180-day early termination program.]  It would on its face rewrite the
> Policy to cover vehicles which are not covered by the Policy....  Should [the insured]
> elect to pursue a 180-day [early termination program] or similar programs in order to
> mitigate damages, it will be required to show not only a sound basis for doing so but also
> that the programs it adopts do not operate to the detriment of [the insurer] under the
> Policy.  It must show that its use of pre-end of lease programs was a justifiable mitigation
> in order to avoid the clear language of the policy that vehicles sold prior to the end of
> lease term are not covered.  Market conditions may change, causing [the insured] to
> reevaluate its mitigation efforts or methods.  The Court does not believe that partial
> summary judgment approving one specific method of mitigation is appropriate at this
> time.

> The Court finds that the holding in *First Union* is not in contradiction with this Court's

conclusion.  As Key correctly points out, in contrast to the early termination program at issue in

*First Union*, its program is not prospective.  Rather, Key points to evidence from its expert

indicating that the early termination program substantially reduced Swiss Re's losses.  Thus, the

fact that summary judgment was not appropriate in *First Union*, does not translate to a finding

that summary judgment is inappropriate here.[8]

---

[8]      Having concluded that Key is entitled to recover for early
         terminations as a result of its mitigation efforts, the Court need not
         address whether estoppel prevents Swiss Re from denying these

13

B.      Lease Extensions

1.      Coverage

In addition to early terminations, the parties cross-move as to whether lease extensions are covered losses under the policies.  Upon review, the Court finds that the clear language in the policies precludes coverage as a matter of law.  The relevant provision is as follows,

> "Declared termination date" means  the date...set forth in writing by a legally enforceable "instrument" at the time of enrollment of an "eligible vehicle," exclusive of any extension[s]...." The "declared termination date" *shall not be extended more than one hundred twenty (120) days* past the "eligible vehicle's" "instrument date...."

(emphasis added).

Key does not dispute that this language, on its face, prohibits it from granting extensions of more than 120 days.  Key argues, however, that the Bacon-Fischer e-mail exchange discussed above modified the policies to permit extensions greater than 120 days.  Key points to the following language in the email sent from Key to Tri-Arc,

3.      How far can we extend?  6 or 12 months?

6 months–need to verify contracts [sic] verbiage.

In the context of early terminations, this Court concluded that the Bacon-Fischer email did not amend the policies.  That conclusion is equally applicable in the context of lease extensions.  Accordingly, Key's argument is rejected.  Because the policy language clearly and unambiguously precludes lease extensions greater than 120 days, the Court finds that losses incurred on vehicles with lease extensions beyond this time period are not covered.[9]

---

claims.

[9]      The Court further rejects Key's argument that lease extensions are covered based on a theory of promissory estoppel.  To succeed

14

2.      Mitigation

As with early terminations, Key claims that even if lease extensions are not covered by the policies, these claims are entitled to coverage as a result of Key's mitigation efforts.  The Court finds that Swiss Re is entitled to summary judgment on this issue for the simple reason that Key fails to point to any evidence indicating that the lease extensions at issue in this lawsuit actually saved Swiss Re money.  Although Key points to evidence supporting the *theory* that lease extensions may be an appropriate form of mitigation, there is simply no indication that in this case the lease extensions granted by Key reduced damages.  In the context of early terminations, Key pointed to the expert report of McCathren, who opined that "KeyBank's Remarketing Program was an effective loss mitigation effort that substantially reduced overall residual value losses and thereby saved Swiss Re tens of millions of dollars of residual value

_____

with its argument, Key must identify a clear and unambiguous promise.  The Court finds that the response received by Key in the email does not satisfy this standard.  Nor does the doctrine of equitable estoppel afford Key coverage.  The policies plainly limit coverage to lease extensions of 120 days.  The email, which indicates that Key can extend leases up to 6 months based on a "need to verify contracts [sic] verbiage" is not a "factual representation" sufficient to bind Swiss Re to Tri-Arc's "approval" of lease extensions.  *See, e.g., National Coin Laundry v. Solon Automated Servs.*, unreported, 1991 WL 88192 (6th Cir. May 28, 1991)(*citing First Fed. Savings & Loan Ass'n v. Perry's Landing, Inc.*, 463 N.E.2d 636, 648 (1983)).  Moreover, any reliance would not be reasonable.  As Swiss Re points out, Key obtained additional coverage by endorsement during the parties' relationship on at least one occasion.  Thus, Key knew the proper way to legally expand coverage.  The Court finds that Key could not reasonably rely on this email as a promise to provide a significant amount of additional coverage.

15

insurance claims."  The "Remarketing Program," however consists of early terminations and auction practices.[10]  It makes no mention of lease extensions.  Having failed to present any evidence that the use of lease extensions reduced Swiss Re's losses, the Court finds that Key may not recover for losses associated with leases extended[11] beyond 120 days.

       3.       Compensatory damages

Key argues that it should be permitted to recover losses incurred on lease extensions as compensatory damages.  Key, however, provides no analysis or detailed argument on this issue.  Given the complex nature of this lawsuit, the Court finds that Key's generalized argument regarding "compensatory damages" without any application of the law to the facts, is insufficient to defeat Swiss Re's motion.  Accordingly, Key may not recover losses incurred on improper lease extensions under the guise of compensatory damages.

C. VER Endorsements

The parties cross-move on whether the residual values set forth in the VER Endorsements apply to the calculation of damages.  A brief summary[12] of the mechanics of the residual value program is in order.  The policies provide that the premium is to be calculated based on the

---

[10]     Key's expert report indicates that the "NP Program" involves the early termination of leases.  *See*, McCathren Report at n. 41.  Key fails to point to any evidence indicating that lease extensions reduced Swiss Re's losses in this case.

[11]     The Court agrees with Swiss Re that regardless of the date the vehicle is returned, Key may not recover for leases extended beyond 120 days.  The plain meaning of the policies precludes such coverage.

[12]     The Court recognizes that the summary may not be applicable in each and every situation.  Rather, the Court simply sets forth the information as background to assist the reader in understanding the dispute.

16

residual values set forth in lease agreements.  Each month Key submitted a vehicle enrollment report, which contains a list of vehicles to be enrolled under the policy, as well as what appears to be the residual value set forth in each lease.  In response, Swiss Re issued "VER Endorsements." On the face of each endorsement, there is an indication of the total premium, as well as the total "residual value" insured.  In addition, the underlying policies indicate that the limit of liability for each lease is the residual value set forth in a particular publication–not the residual value set forth in the lease agreement.  The policies also provide Swiss Re with the right to audit the figures set forth in the enrollment reports.

Swiss Re argues that the underlying policy provisions were not altered by the issuance of the VER Endorsements.  Therefore, Swiss Re claims that the residual value losses cannot exceed the residual values set forth in the applicable publication.  Key claims that the endorsements changed the terms of the policy.  Specifically, Key argues that by agreeing to "insure" the residual values set forth in the endorsements, the parties agreed that losses would not be limited by the terms in the policies.  As such, Key is entitled to recover losses based on the residual values set forth in the endorsements, which appear to equal the residual values contained in the leases.  Swiss Re responds that, even accepting Key's argument, the endorsements expressly provide that the coverages are still subject to Swiss Re's right to audit the figures.  Thus, Swiss Re claims that it is permitted to audit the claims in a manner that limits recovery to the amounts set forth in the publications.

The relevant provisions[13] are as follows,

_____

[13]     Neither party claims that there is any relevant difference among the applicable policies.

17

III.    PREMIUM:

A.    The "Named Insured" must pay the "Company" at the time of enrollment of each "eligible vehicle" a non-refundable and fully earned premium determined by multiplying the following percentage times the *"instrument" "residual value"* for each "enrolled vehicle":

[percentages omitted].

(emphasis added).

IV.    DEFINITIONS:

\*\*\*

N.    "RESIDUAL VALUE" – means the future dollar value of an "enrolled vehicle" calculated by the use of the "approved residual value publication" in effect on the date of origination of the financing or lease "instrument" or agreement.  The "residual value" of an "enrolled vehicle" shall be adjusted for any non-standard mileage and the presence or absence of optional equipment.  *In no case shall the "Company's" liability for each "enrolled vehicle" be greater than the published "residual value" as set forth in the "approved residual value publication"* and audited by the "Company" in event of a claim....

**In the event that the "residual value" accepted by the "Company" differs from that reported by the "Named Insured", the "Company's" determination shall be binding only if it is determined that the "Company's" assessment is properly documented in the "approved residual value publication."**

(italics added; bold in original).

V.    CONDITION PRECEDENT TO LIABILITY:

A.    MONTHLY REPORTING: The "Named Insured" must enroll "eligible vehicles" by sending a monthly electronic enrollment report to the "Company", or its agent, together with the applicable premium....

B.    VEHICLE ENROLLMENT: The "Company", or its agent, will provide an acknowledgment to the "Named Insured" for each enrollment report received by the "Company".  The "residual value" of each "enrolled vehicle" will be subject to an audit by the "Company" at any time to determine if the "Company's liability was correctly stated on the

18

acknowledgment report according to the terms, conditions, and provisions of this policy.

The VER endorsements indicate as follows,

CHANGES

In consideration of an additional premium of $375,671.18, it is agreed that with respect to coverages provided by the policy and in accordance with Section V., the Vehicle Enrollment Report for [a specific month] is received and acknowledged by the 'Company.'

    1.  Total Number of "Enrolled Vehicles"        [number]

    2.  Total "Residual Value" Insured        [number]

Upon review, the Court finds that Swiss Re is entitled to summary judgment.  The Court finds that Key's interpretation of the VER endorsements must be rejected.  According to Key, the amount listed on the endorsements is the actual value insured.   Key's argument, however, cannot be reconciled with the fact that the first pages of the endorsements clearly identify that the dollar figure constitutes the "Residual Value" insured.  By placing the term "residual value" in quotation marks and using capital letters, the parties clearly intended to use a term defined in the policies.  The term "Residual Value" incorporates the limitation of liability urged by Swiss Re.  Thus, on its face, Key's claim that the endorsements supplant the phrase "residual value" must be rejected.[14]

_____

[14]     To the extent Key is somehow claiming that the dollar figure replaces the definition of "residual value," the argument is rejected.  Certainly the term "residual value" is central to the policies and it would make no sense whatsoever to replace the phrase with a number on an ongoing basis.  These endorsements were issued each month.  To accept Key's argument would essentially mean that each month the parties agreed to amend the definition of "residual value" to a new number.  In turn, it would seem then that the only definition of "residual value" remaining is

19

The Court agrees with Swiss Re that the only logical reading of the endorsements is that the numbers set forth on the endorsements are intended to equal the amount of "residual value" insured, as that term is defined by the policies.  Thus, to the extent the number listed on the page of the endorsements exceeds the amounts in the approved residual value publication, Key may not recover for the additional amount.  Moreover, the Court agrees with Swiss Re that the endorsements expressly indicate that they are issued in accordance with Section V, which provides Swiss Re with the right to audit the residual values listed on the endorsements in any event.

Key claims that the bold portion of Section IV, Paragraph N means that Swiss Re's right to audit existed only up until such time as Swiss Re or its agent "acknowledged" the endorsements.  On its face, however, the definition of "residual value" indicates that the audit will be conducted in the event of a *claim*.  Obviously, claims would not be submitted until well after the enrollment reports were acknowledged by the insurer.  Moreover, the fact that the bold portion of Paragraph N provides that Swiss Re's determination is binding only if the residual value amount is documented in the "approved residual value publication," supports this Court's conclusion that the endorsements do not amend the definition of "residual value."

Key essentially argues that its interpretation must be accepted in order to give effect to the fact that the endorsements indicate that they "change" the policies.  According to Key, absent a change in the definition of residual value, there was no material change to the policies.  This Court disagrees.  As Swiss Re points out, the endorsements identify the premium paid, which is

_____

the final number set forth in the last endorsement.  Certainly, Key cannot be suggesting that the only "residual value" insured is the number appearing in that last endorsement.

20

not set forth in the policies.  In addition, as discussed immediately below, the parties agreed to amend the definition of "enrolled vehicle."  Thus, the endorsements did effect "changes" to the policies.

The Court finds that the only logical reading of the VER endorsements results in summary judgment in favor of Swiss Re.  The residual values set forth in the VER endorsements do not control for the purpose of computing damages.

Key also argues that the VER endorsements identify the specific vehicles enrolled under the policies.  Although not expressly clear, it appears that certain vehicles listed on the endorsements would not otherwise qualify as "enrolled vehicles" as that term is defined in the policies.  Swiss Re does not directly dispute Key's contention.  Instead, Swiss Re argues that simply appearing on the VER endorsement does not render the vehicle free from other policy provisions.  For example, Swiss Re argues that in the event one of the vehicles identified in the endorsement is extended beyond 120 days, coverage would be unavailable even though the vehicle was "enrolled."  Key, however, is not disputing Swiss Re's position.  Rather, Key simply seeks a ruling that the vehicles appearing on the VER endorsements are "enrolled vehicles," even if they may not otherwise qualify as "enrolled vehicles" as that term is defined in the policies.[15]  On that narrow issue, the Court agrees with Key.  As Key points out, Swiss Re

---

[15]     For example, the policies define "enrolled vehicle," in part, as an "eligible vehicle."  "Eligible vehicle" in turn is defined as a vehicle listed in the "approved residual publication."  It appears that some vehicles listed on the VER endorsements do not appear in the "approved residual value publication."  By stipulating that the vehicles listed in the endorsements are enrolled vehicles, Swiss Re is precluded from denying coverage on the grounds that the vehicle is not an "eligible vehicle."  The definition of loss is dependent on whether a vehicle is an "enrolled vehicle," not an "eligible

21

stipulated during this litigation that the vehicles identified in the endorsements are in fact

enrolled vehicles.  As such, there can be no dispute on this issue.

      D.     "Approved Residual Value Publication"

Having concluded that the residual values in the VER Endorsements do not control, the

Court now turns to Key's argument that its own guidebooks must be used to calculate loss.  As

set forth above, the residual values insured are limited to those set forth in the "approved residual

value publication."  That term is defined as follows,

> B.     "APPROVED RESIDUAL VALUE PUBLICATION(S):– means the following for;
>
>     1.     NEW and USED VEHICLES: ALG Residual Percentage Guide specifically promulgated as KeyBank's Standard Custom Residual Guide.
>
>     2.     NEW VEHICLES ONLY: ALG Residual Percentage Guide specifically promulgated as KeyBank's Special Edition Custom Residual Guide.

As Key points out, ALG is an acronym for "Automotive Lease Guide, Inc."  ALG

publishes residual value guidebooks for various automobile lessors.  Key contracted with ALG

to publish two guidebooks specific to Key's leasing business.  The "standard"edition sets forth

residual value guidelines applicable to vehicles leased by Key in the eastern half of the United

States.  In addition, the "special edition" applies to vehicles leased in the western half of the

country.  Together, these guides are referred to as Key's "custom" guides.  ALG mailed these

guidebooks to automobile dealers that leased vehicles for Key.  In addition, ALG published the

ALG Residual Percentage Guide, which is a generic publication setting forth residual values

---

      vehicle."

across the nation.  Key points out that some lessors did not contract with ALG to publish customized books and, instead, used ALG's Residual Percentage Guide.

Key argues that the applicable "residual value publications" to be used to calculate loss are the guidebooks ALG published for Key.  Although opposing Key's argument that its custom guidebooks control, Swiss Re admits in its own motion and reply brief that "both sides agree that Key's Custom Guide is the 'approved residual value publication.'"  (Reply Brief at 8). Accordingly, the Court finds that the phrase "approved residual value publication" refers to Key's Standard Custom Residual Guide and Key's Special Edition Custom Residual Guide.

In addition to disputing the applicable residual value guide, the parties argue over whether "caps" apply to the policies.  This issue was addressed by the Court in the liability phase of this case.  Swiss Re argued that, based on negotiations leading up to the issuance of the 4019 policy, as well as the clear language contained in the binder, the parties intended that residual values would be "capped" at ALG/ALG+3.  Key responded that no such limitation appears in the policy.  The Court concluded that issues of fact precluded summary judgment in favor of either party on the issue of "caps," in large part because neither party developed a clear understanding of the overlap between the definition of "approved residual value publication" and caps.

Having concluded that Key's guidebooks constitute the "approved residual value publication," the Court finds that Key is entitled to summary judgment on the issue of caps. Swiss Re does not dispute that Key's guidebooks do not contain the ALG/ALG+3 cap.  In the context of ruling on the earlier summary judgment motions, the Court noted that Swiss Re's argument required resort to the parties' negotiations and the binder, which are both clearly belied by the lack of caps provision in the policy.  The Court, however, concluded that Key was not

23

entitled to summary judgment because the phrase "approved residual value publication" was ambiguous and the Court could not determine whether the "approved residual value publication" contained caps.  Swiss Re, however, concedes that the phrase means Key's custom guidebooks. Thus, any ambiguity is resolved.  To the extent Swiss Re is arguing that the binder and the parties' negotiations somehow also enter into the definition of "approved residual value publication," Swiss Re's own concession negates its position.  Moreover, the definition clearly and unambiguously requires a "publication."  In that Key's custom guidebooks do not contain caps, the Court finds that residual values are not capped at ALG/ALG+3.[16]

E.      Mileage Instructions

Key argues that the mileage instructions set forth in its custom guidelines must be utilized to ascertain residual value.  Swiss Re claims that it is "premature" to make this determination until the issue of "caps" is resolved.  Swiss Re concedes that, in the event the jury concludes that there are no ALG "caps," then the mileage instructions in Key's custom books will control.  As set forth above, the Court concludes that as a matter of law caps do not apply. As such, the Court finds that the mileage instructions contained in Key's custom guidebooks control for purposes of calculating residual value.

F.      Proration of Lease Extensions

The parties cross-move on whether the residual values set forth for leases extended by

---

[16]      The Court reviewed the evidence presented in the motions for summary judgment related to liability.  Although the Court recognizes that the parties addressed the issue of caps in the liability phase, Key is not precluded from raising the issue again in this motion.  The Court finds that this issue is more related to damages than liability.

three months must be prorated.  According to the parties, the relevant policy provision is as

follows,

> N.   "RESIDUAL VALUE" – means the future dollar value of an "enrolled
> vehicle" calculated by the use of the "approved residual value publication"
> in effect on the date of origination of the financing or lease "instrument"
> or agreement....  *If the declared "termination date" falls between the*
> *designated terms in the "approved residual value publication," the*
> *"residual value" will be prorated to the actual number of months in the*
> *term....*

(emphasis added).

Key's custom guides set forth specific residual values for lease terms of 24, 36, 48 and 60

months for each make and model.  In addition, the guidebooks indicate that, in the event of a

three-month lease extension, there will be no adjustment to the residual value.  Specifically, the

guidebooks provide,

> I.   Three Month Term Addition
>
>                            ***
>
> Add 3 months to regular lease terms and customer receives 1,250 miles
> per month (standard program) or 1,000 miles per month (low mileage
> program) for each additional month <u>with no required adjustment to the</u>
> <u>residual value</u>.

(emphasis in original).

Thus, according to the guidebooks, in the event a three month term is added to a 36-

month lease, thereby constituting a 39-month lease, the residual value applicable to a 36-month

lease is to be used to calculate loss.

The parties do not dispute that lease terms of 36, 48 and 60 months are designated terms

for purposes of calculating residual value.  Each of these terms is contained in chart form with

corresponding residual values listed for various vehicles.  Key argues that, because of the three-

25

month term addition language in its guidebooks, lease terms of 39, 51 and 63 months are also "designated terms."  Because Key's guidebooks designate that the residual values applicable to these lease terms are those applicable to 36-, 48- and 60-month leases respectively, proration is not required.

On the other hand, Swiss Re argues that the only lease terms "designated" in the guidebooks are 36, 48 and 60 months.  Swiss Re claims that, because the three-month addition program does not expressly provide specific percentage values, these "off-lease" terms are not "designated" in the guidebooks.  Swiss Re further points out that to accept Key's argument would essentially render the proration provision moot.  According to Swiss Re, Key would have the unilateral authority to put any extension into its guidebooks and simply indicate that "no residual value" adjustment should occur.  Swiss Re claims that the three month addition program is a mechanism designed by Key to allow its dealers to provide incentives to potential lessees.  As such, Swiss Re argues that Key's instructions to its dealers cannot trump the clear policy language requiring proration for "odd-term" leases.  In addition, Swiss Re points out that Key's expert testified that it is typical in the residual value insurance industry to prorate terms other than 36, 48 and 60 months.

Upon review, the Court finds that Key is entitled to summary judgment.  The parties do not dispute that Key's custom guidebooks control for purposes of setting residual values.  The Court finds that the policy provision addressing residual value clearly and unambiguously requires proration only for lease terms not expressly designated in the guidebooks.  As Key correctly argues, to "designate" simply means to "indicate or specify; point out."  Any individual resorting to the guidebooks in order to ascertain the residual value for a 39, 51 or 63-month lease

26

would discover that the residual values for these leases equals the residual values for 36, 48 and 60 month leases. Therefore, the Court finds that these terms are designated in the guidebooks.

The Court rejects Swiss Re's claim that this interpretation gives Key unfettered discretion to write the proration requirement out of the contract.  In addition, Swiss Re's argument that this portion of the guidebooks simply contains instructions to Key's dealers is untenable.  Both positions are contradicted by the fact that the parties expressly agreed to reference Key's guidebooks for the purpose of ascertaining residual values.  This Court's conclusion does not render the definition of "residual value" meaningless in this case.  In the event leases are originated with any term other than 36, 39, 48, 51, 60 or 63, proration would be required.  Based on the clear language contained in the policy, together with the residual values set forth in the guidebooks, the Court finds that Key is not required to prorate for leases originated based on Key's three-month addition program.[17]

G.     MSRP

Key moves for summary judgment asking the Court to rule that Swiss Re's calculation of MSRP should be rejected as a matter of law.  Swiss Re's calculation of MSRP does not include manufacturer discounts.  Neither the policy language nor Key's custom guidebooks discuss the

---

[17]     Swiss Re argues that the three-month addition program is simply an "instruction" to Key's dealers and, therefore, cannot be considered for purposes of calculating residual value.  As an initial matter, there is no indication in the guidebook that the three-month addition program is simply an instruction to Key's dealers. Moreover, the parties agreed that the residual values designated in the guidebooks would control for purposes of calculating loss. Thus, regardless of whether Key's guidebooks are simply "instructions" to dealers, the parties expressly agreed to base their loss calculations on these books.  Accordingly, Swiss Re's argument is rejected.

calculation of MSRP.  Over at least a two-year period, Key submitted enrollment reports containing a calculation of MSRP that includes manufacturer discounts.  Neither Reliance nor Swiss Re objected.

Key argues that MSRP must be calculated by adding back manufacturer discounts.  Key points to expert testimony from its own expert, as well as Swiss Re's, indicating that industry custom and practice requires the addition of manufacturer discounts when calculating MSRP.  In addition, Key points out that Swiss Re's expert added manufacturer discounts into MSRP when analyzing Key's alleged damages.

In response, Swiss Re provides no evidence supporting a claim that manufacturer discounts should be excluded from MSRP.  Rather, Swiss Re argues that, in the event the Court finds that manufacturer discounts are to be added, then "MRM[18]" must also be applied in analyzing Key's losses.  According to Swiss Re, these two concepts rise and fall together.  Swiss Re claims that Key is seeking to add the manufacturer discount, yet avoid MRM.  Swiss Re points out that its expert testified that both theories should be applied in assessing damages.

Upon review, the Court finds that Key is entitled to summary judgment.  In the face of Key's evidence, Swiss Re presents nothing whatsoever supporting an argument that manufacturer discounts should not be included in MSRP.  Rather, Swiss Re attempts to argue that MRM also applies.  Swiss Re, however, did not move for summary judgment on this issue. Moreover, it is apparent from Swiss Re's argument that the use of MRM does not implicate the setting of MSRP.  Swiss Re describes MRM as a "more conservative" number set by ALG that takes into account how certain "extras" will retain their value.  According to Swiss Re, applying

---

[18]        "MRM" stands for "maximum residualized MSRP."

the concept of "MRM" requires utilizing the *lower* of MSRP or MRM.  Thus, by definition, these numbers are mutually exclusive.  Thus, to the extent Swiss Re is somehow arguing that the Court cannot enter summary judgment on the issue of adding back manufacturer discounts without addressing MRM, the argument is rejected.[19]

### H.      Frame Damage

The parties cross move on whether Key must adjust its damages as a result of losses incurred  due to repaired frame damage.  The relevant policy provision is as follows,

> VII.      EXCLUSIONS: This policy does not cover "loss":
>
> > B.      Resulting from loss of value to an "enrolled vehicle" due to mechanical or physical damage, excessive wear and tear as determined on or before the "declared termination date" or "off lease" date of the "enrolled vehicle."

The parties agree that Key is not entitled to recover for any loss in value due to physical damage that exists when the lessee returns the vehicle.  The parties dispute, however, whether Key must exclude loss in value due to *repaired* frame damage.  For example, in the event an automobile is involved in an accident and is properly repaired, the automobile may be worth less than a comparable vehicle not involved in accident.  Essentially, this loss in value is "stigma" damage.

According to Key, the provision does not exclude coverage for "stigma" damage.  Key claims that the exclusion only applies to damage "as determined on or before" the termination

---

[19]     The Court is careful to note that it is opining only on the narrow issue presented by Key.  Key is entitled to a finding that manufacturer discounts are to be added to MSRP for purposes of calculating damages.  The Court makes no finding as to whether MRM applies in that neither party sought summary judgment on this issue.

date.  Thus, Key claims that the damage must exist as of the termination date in order to be excluded from coverage.  Because vehicles with *repaired* frame damage no longer have "mechanical or physical damage," the exclusion does not apply.[20]

Swiss Re claims that the provision clearly excludes coverage for loss in value caused by physical damage, regardless of whether the damage exists at the time of termination.  According to Swiss Re's argument it is the "loss in value–" not the physical damage– that must exist when the vehicle is returned.

Although both parties claim the clause is clear and unambiguous, the Court finds that the exclusion is capable of more than one reasonable interpretation.  It is not clear from the face of the policy whether it is the "loss in value" or the "physical damage" that must be determined on or before the "declared termination date."  Either reading of the provision is rational.  As Key correctly points out, however, Ohio law precludes an insurer from relying on an exclusion unless the insurer is able to establish that its interpretation "is the only one that can fairly be placed on the language in question."  *Anderson v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001).  Thus, where an exclusion is ambiguous, it must be construed so as to afford coverage to the insured.  *St. Mary's Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 993 (6th Cir. 2003).  Having failed to establish that the provision clearly and unambiguously excludes coverage for "stigma" loss, the Court finds that Key is entitled to summary judgment.

This Court's conclusion is also supported by the extrinsic evidence contained in the briefs.  Key points out that Swiss Re's expert testified that he was unaware of any industry

---

[20]     The parties do not dispute that the repairs were adequate to repair the physical damage to the vehicle.

custom or practice that permitted a reduction for losses resulting from repaired frame damage. Key's expert also opined that no such custom or practice exists.  Moreover, this Court ordered Swiss Re to compile a list of systematic errors it believed Key made in calculating its losses. Swiss Re propounded this list in 2004, yet did not indicate that Key erred by failing to reduce its claims by loss due to repaired frame damage.

Having concluded that the provision does not act to exclude loss from repaired frame damage, the Court need not reach the parties' remaining arguments.

I.      Excess Wear and Tear

Swiss Re moves for summary judgment on the grounds that Key breached the parties' agreement by failing to properly calculate "market value."  The relevant policy provision is as follows,

> "MARKET VALUE" – means the dollar value of the sales proceeds received by the "Named Insured" for any "enrolled vehicle".  Sales proceeds shall include any...wear and tear adjustments entitled by the "Named Insured" according to each "enrolled vehicle's" "instrument".

In addition, the policy excludes losses incurred as a result of excess wear and tear.  There is no dispute that, for vehicles sold at auction, Key calculated market value by adding together the sales price and any applicable charge for excess wear and tear.  The parties dispute, however, whether Key properly calculated "market value" for vehicles sold through Key's early termination program.[21]  According to Swiss Re, Key was obligated to inspect each vehicle for excess wear and tear.  In the event a vehicle suffered from such damage, Swiss Re claims that Key was obligated to add the value of the excess wear and tear to the selling price in order to

_____

[21]      It appears that these vehicles were sold either to the lessee or a dealer.

31

arrive at "market value."  Key disagrees.  Although indirectly presented, it appears that Key is claiming that it was not required to add together the selling price and the charge for any excess wear and tear.  Rather, Key claims that it never sold a vehicle through its early termination program at less than the Black Book Wholesale Average ("BBWA") value.  Key provides evidence that this value presumes that the vehicle has *no* excess wear and tear.  Thus, according to Key, the sales proceeds always included any excess wear and tear, because the selling price was inflated.

Upon review the Court finds that Swiss Re's motion must be denied.  As an initial matter, the definition of "market value" does not require the calculation urged by Swiss Re.  Rather, on its face, the provision simply requires that the sales proceeds include any amount of excess wear and tear.  Key provides evidence that the numbers in its sales proceeds do include any amount attributable to excess wear and tear.  Swiss Re points to no mechanism in the policy requiring Key to perform an independent calculation of this amount.[22]  Rather, as long as the ultimate sales proceeds is sufficient to include any amount of excess wear and tear, Key's calculation of "market value" does not contravene the policy.  Key provides evidence indicating that, by utilizing BBWA value, any amount of excess wear and tear present in early terminations is included in the sales proceeds.  Swiss Re fails to provide any evidence in response.  Absent some additional evidence or analysis, the Court simply cannot say that Key's use of BBWA value does not include an amount sufficient to cover any excess wear and tear.  Thus, while the Court agrees with Swiss Re that the sales proceeds must include an amount sufficient to cover excess wear

---

[22]  Swiss Re also argues that Key was obligated to inspect for any excess wear and tear.  Again, Swiss Re points to no policy provision requiring an inspection.

and tear, Swiss Re fails to present any evidence that Key breached this provision.

Moreover, Key claims that it was not required to charge the lessees who purchased their vehicles through its early termination program because its decision to forego the charge resulted in the mitigation of Swiss Re's damages.  Swiss Re does not respond to this argument. Accordingly, for this additional reason, the Court finds that Swiss Re is not entitled to summary judgment.

J.      Interim Loss Payments

Swiss Re moves for summary judgment seeking a ruling that the policies do not require interim loss payments.  Key opposes Swiss Re's request.

The relevant policy provisions are as follows,

> "LOSS" – means a dollar amount calculated on all "enrolled vehicles" which has been properly, reported to, and acknowledged by, the "Company" during the policy term as follows:
>
> 1.      The "aggregate insured residual value" of all "off lease" "enrolled vehicles" minus the cumulative total dollar "market value" for all such "off lease" "enrolled vehicles".
>
>      The "Named Insured" will furnish the "Company" a "loss" report which provides such calculated dollar amount monthly until all "enrolled vehicles" during the policy term are terminated or "off lease."
>
> "Loss" Payment: The "Company" will pay or make good any "loss" covered within thirty (30) days after. [sic]
>
> 1.      The "Company" reaches agreement with the "Named Insured":
>
> 2.      The entry of final judgment; or
>
> 3.      The filing of an arbitration award

It appears that Key claims that the policies require Swiss Re to make monthly loss

payments.  Swiss Re claims that there is no such requirement.  Rather, according to Swiss Re, "loss" is to be calculated only after all of the enrolled vehicles come off lease.  Moreover, Swiss Re points out that the "loss" payment provision expressly indicates that any "loss" will be paid thirty days *after* an agreement is reached, final judgment is entered or an arbitration award is filed.  Key claims that these provisions require Key to submit loss calculations on a monthly basis and, further, require Swiss Re to promptly adjust the figures and agree with Key on the amount of loss.  Upon agreement, Swiss Re was obligated to pay Key for the loss within thirty days of the parties' agreement.  According to Key, the fact that the policies required Key to calculate "loss" on a monthly basis, forecloses Swiss Re's position.  Key claims that Swiss Re's position is based on the notion that "loss" cannot be calculated until the last vehicle is "off lease."  In addition, Key points out that in two places the policies refer to "loss payment*s*," lending further support to Key's position that "loss" is not to be paid on a one-time basis.  Key further argues that the parties subsequently amended the policies in the Bacon-Fischer email to require monthly payments.  In the alternative, Key claims that the language is ambiguous and points to extrinsic evidence in support of its position.

Upon review, the Court finds that Swiss Re is entitled to summary judgment.  On its face, the phrase "loss" is plainly defined as the difference between the "aggregate insured residual value" minus the cumulative market value of *all* enrolled vehicles.  "Aggregate insured residual value," in turn, is defined as the sum of all "enrolled vehicles'" residual values *under this policy*...."  The meaning of this language could not be more clear.  To calculate loss, you take the total residual value insured under the policy and subtract the total market value obtained for all the vehicles upon lease end.  Key's attempt to read into these provisions the requirement that

34

loss be calculated on a monthly basis is simply not supported by any policy language.

The Court rejects Key's claim that the reference to "loss" reporting, which must be done on a monthly basis, somehow requires Swiss Re to pay losses on a monthly basis.  The Court certainly comprehends Key's argument, i.e., if Key is required to provide a monthly "loss" report then "loss" must be capable of calculation prior to the time the last vehicle is "off lease."  However, the Court finds Key's reading to be tortured.  As set forth above, the first paragraph of the definition of "loss" refers to the "aggregate insured residual value," which is expressly calculated based on *all* of the vehicles *enrolled under the policy*.  Key's reading of the second sentence wholly ignores and renders meaningless the first provision.  Rather, the Court finds that the only fair reading of the second sentence is that it simply addresses monthly reporting of loss, until such time as "all 'enrolled vehicles' *during the policy* term are terminated or 'off lease,'" at which point loss may actually be calculated.   It simply does not state that losses may be incurred on a monthly basis.

The Court further rejects Key's argument that the use of the phrase "loss payment*s*" means that Swiss Re's interpretation is erroneous.  There is nothing in the policy foreclosing multiple payments.  For example, it would certainly have been possible for the parties to reach agreement with respect to the payment of certain claims, but disagree with respect to coverage on others.  If after the last vehicle came "off lease," Swiss Re and Key agreed on coverage for claims stemming from enrolled vehicles other than west coast used vehicles, then the policies obligate Swiss Re to make a payment within thirty days of the parties' agreement.  If, however, the parties could not agree on whether west coast used vehicles are entitled to coverage, perhaps no payment would be due until a final judgment was reached.  In that event, multiple payments

35

are certainly *possible* absent a finding that interim payments are required.[23]

Key also argues that, to the extent the policy does not expressly require interim payments, the Bacon-Fischer email amended the policy to provide for monthly payments.  The Court agrees with Swiss Re, however, that the email falls far short of constituting an amendment to a multi-million dollar insurance policy.  As set forth above, the Court has already concluded that the email does not constitute an amendment.  Accordingly, summary judgment in favor of Swiss Re is warranted.[24]

II.     Claims Lacking Original Source Documents

Key asks this Court to preclude Swiss Re from "zeroing out" claims with lease files missing source documents.[25]  According to Key, the policies do not require Key to maintain original source documents.  Swiss Re responds that Key is obligated to come forward with sufficient evidence of its damages.  Thus, regardless of whether the policies require Key to maintain original source documents, Key is unable to establish damages if the lease files lack these documents.

In this case, the parties agreed to utilize random sampling analyses for purposes of computing damages.  Key submitted approximately 85,000 claims to Swiss Re for payment.  The

---

[23]     The Court uses this example purely for illustration and makes no "finding" on the point.  Rather, the Court is simply noting that Key's reference to the possibility of multiple payments does not contradict Swiss Re's interpretation.

[24]     Having concluded that the policy provisions clearly and unambiguously do not require interim payments, the Court need not address the extrinsic evidence submitted by the parties.

[25]     "Source documents" include items such as the lease, bill of sale and odometer reading.

parties each reviewed a portion of the lease files to extrapolate Key's alleged damages.  It appears that both parties' analyses concluded that the lease files fall within three categories.  The first category consists of files containing all source documents.  It is undisputed that these files are capable of valuation.  The second category consists of files missing at least one source document, but containing sufficient documents from which the value of the file can be ascertained.  The third category consists of files lacking so many documents that no value can be determined simply by  reviewing the file itself.[26]

Swiss Re assigned a value of "zero" to all files falling in categories two and three.  In other words, if a lease file was missing even one document, Swiss Re claims Key may not recover any damages for these vehicles.   Key moves for summary  judgment on the grounds that Swiss Re is not permitted to assign a value of "zero" to any lease file in these latter two categories.  Each category of files will be addressed in turn.

With regard to files missing some documentation, but otherwise capable of calculation based on a file review, the Court finds that Key's request must be granted.  There is no policy requirement obligating Key to maintain specific documents.  Thus, simply noting that a particular document is missing from the file does not mean Key is not entitled to recover damages for these vehicles.  Accordingly, Swiss Re is precluded from assigning a value of "zero" to a file otherwise capable of calculation based on a file review.

The Court finds, however, that Key's request with regard to the third category, i.e., files incapable of valuation based on a file review, must be denied.  Key bears the burden of

---

[26]     The Court notes that it is not opining as to whether any particular file falls within a particular category.

establishing its damages to a reasonable degree of certainty.  Key argues that its statistical analysis satisfies this standard.  While the Sixth Circuit expressly recognizes that the use of random sampling analysis may be proper where there is a large amount of data to analyze, *see, e.g., Michigan Dep't of Edu. v. United States Dep't Edu.*, 875 F.2d 1196 (6th Cir. 1989), there is no legal authority holding that the use of a random sampling *conclusively* establishes the amount of a claimant's damages.  Thus, the burden remains on Key to establish its damages to a reasonable degree of certainty.

By assigning a value of "zero" to files incapable of valuation based on a file review, Swiss Re's expert essentially claims that these files cannot be calculated to a reasonable degree of certainty.  Notably, Key does not explain its statistical analysis in any detail or otherwise prove that the analysis is unquestionably reliable, especially as it relates to files in the third category.  In the face of Swiss Re's evidence that these files are not capable of valuation, i.e., a value cannot be determined by reviewing the file, the Court finds that there is a question of fact as to whether Key's statistical analysis establishes its damages to a reasonable degree of certainty with respect to the lease files falling within category three.

III.    Key's Consequential Damages

Swiss Re moves for summary judgment on the grounds that Key is not entitled to recover consequential damages.  According to Swiss Re, Key cannot establish that it is entitled to damages in either contract or tort.  Key concedes that it is seeking consequential damages only with respect to its bad faith claim.  Thus, this Court need only analyze whether Key may recover consequential damages in tort.  Key's alleged consequential damages consist of lost profits, expenses paid to RSA, cost of capital allocation, cost of entering into "negative spread loans"

and employee severance costs.  Each category will be addressed in turn.

A.      Lost profits

In early May of 2001, Key announced its decision to exit the automobile leasing business.  The decision was made by Key's chief executive officer, Henry Meyer, and was based on the recommendation of Thomas Stevens.  The board of directors approved Meyer's decision. This decision, along with others, was announced in a press release dated May 17, 2001.  The release does not provide a reason for the decision to exit the auto leasing business.  Later that day, Meyer and other Key executives participated in a Strategic Announcement Conference Call to discuss the information contained in the press release.  A financial analyst from Morgan Stanley specifically asked Meyer to explain the timing of his decision to exit the auto leasing business.

> David Hilder: Good afternoon.  I guess I'd like to follow up on the timing question, but specifically, with respect to the auto leasing business.  It's been– I guess my question is why did you take this action now?  It's been clear for at least a year that residual values were declining and that some of the assumptions behind the economics of that business were changing.

> Henry Meyer: You're absolutely right.  We didn't wake up last month and say wow, the leasing business has gone to being great to being good.  The leasing business has not been good for a long time.  It was a combination of the changes in the accounting rules that are coming up, the desire by the new CEO to not continue to support low-yielding portfolios.  We've been a company that has gotten out of many of the commodity-like businesses.  And I think you're analysis is right.  This is one portfolio that we have been slow to address.  I wanted to address it and I pushed for that.

In addition, Key addressed the cessation of its auto leasing business in the 2001 annual report as follows,

> It took Henry Meyer just a few hours after becoming Key's chairman on May 17, 2001, to make clear his vision.  "From now on," he told shareholders, "this company will focus on long-standing strength: building relationships with clients."

In support of this goal, Meyer announced that day that Key would quit auto leasing, scale back auto lending to its core banking markets and exit nonrelationship nationally syndicated leveraged credits.

At the time the decision to exit the auto leasing business was made, Key officials were aware of a dispute over insurance coverage.  While on the Strategic Announcement Conference Call, Meyer announced as follows,

In addition, we needed to establish a reserve for the residual value insurance dispute. And, believe me, I think we did everything right, from a business perspective two years ago when we made a decision to insure our residual value with outside insurance companies.  Unfortunately, as all of you know, your insurance is only as good as the ability and willingness of the insurance company to honor your claims.  And its been widely publicized that...a number of insurance companies are balking at the claims being made.  And we're in that position too.  So to get out of this problem, to put it behind us as we exit this business, we needed to take a charge for that residual value insurance.

It appears from Meyer's deposition testimony that he believed only a portion of the residual value claims were being disputed.

Q:     Do you recall recommending to the board that a reserve be set up for the disputed amount of the insurance claim made to Reliance?

Q:     Yes, I do.

Q:     Can you explain the circumstances under which you made that recommendation, please?

A:     Yeah.  I was being told by the line of business and by the financial group that our claims were not being honored by the insurance company....  And at the time I had some confidence that the issue would be resolved and I was giving the company 12 months approximately in that 40 million dollar number.

Q:     At the time you did understand there were ongoing discussions with Reliance about trying to resolve the differences?

A:     Yes.  At the time we were trying to work out–and again, as we've characterized the discussions with the board, this was to cover the disputed part, but we thought we were covered and would collect on the undisputed part of the negotiation.

Q:     And you remember discussing that with the board in May of 2001?

40

A:    I remember without going into what the disputed and undisputed, but yes, I raised the issue of we had a dispute and this charge was to cover the disputed part.  At that point in time I had no idea that the insurance company would continue to dishonor any claims.

Q:    Did you tell the board that you expected to resolve the matter within the next year or two with Reliance?

A:    I'm pretty sure that I did.  That's the reasoning for why we took a charge equal to approximately what would catch up and go about 12 months into the future.

Q:    And at the time you anticipated getting paid for the undisputed amount and hopefully working out something with respect to the disputed amount with Reliance; isn't that correct?

A:    That's exactly where I thought we were....

                                                    ***

Q:    Without regard to the residual value dispute with the insurer, how was getting out the leasing business going to strengthen the financial performance of the company?

A:    Well, there was huge uncertainty about what the profitability of this line of business was going to be over the next three to four years....  At the time, quite obviously, I felt that 40 million dollars was all I needed to put away to resolve the issue.  Had I known at the time that five years later we had a 350 million dollar issue, it would be a no-brainer decision to get out of the line of business.

Q:    ...You've already testified that the company was going to have the same exposure, whatever it was, whether you continued to lease cars or not, so how did getting out of the business help the company...perform better?

A:    ... I didn't think in my wildest dreams that insurance companies like Reliance and Swiss Re were going to [renege] on premiums that were paid.  Had I known that I had a 350, 380 million dollar issue that I was going to be debating in court–...given the reputation that Swiss Re had in my mind up to that point in time, why would I stay in a business where I can pay premiums and the insurance company can say, "well, thank you for your premium but we're not going to pay?..."

        Swiss Re further points out that Key treated its expected insurance payments in a

receivable income account for many months after Key exited the auto leasing business.

41

Swiss Re argues that the losses Key was facing could not impact its decision to exit the business.  Swiss Re points out that the policies at issue expired and, as such, any new leases would have to be insured through another company in any event.  Thus, Key would face the losses at issue in this case *regardless* of whether it continued in the auto leasing business.

As set forth above, Thomas Stevens assisted Henry Meyer in deciding to exit the auto leasing business.  Stevens testified that the inability to collect losses on leases booked in the past would have an impact on the decision, even though these losses existed regardless of whether Key continued in the business.  Specifically, Stevens testified as follows,

> You can't justify staying in a business where you're taking those losses.  As managers, how can you justify staying in a business when you're facing those losses and continuing in the business?

Contrary to Swiss Re's evidence, Key claims that there is sufficient evidence in the record indicating that Swiss Re's denial of coverage resulted in Key's decision to exit the auto leasing business.  Specifically, Key points out that Meyer testified that he based his decision to exit the auto leasing business on the residual value insurance dispute.  Several other high level Key officials testified that the "insurance dispute" affected Key's decision to exit the auto leasing business.[27]

---

[27]  Swiss Re correctly points out that the contemporaneous evidence indicates that Key's decision to exit the auto leasing business was not due to Swiss Re's alleged bad faith.  Rather, the contemporaneous evidence strongly suggests that Key exited this line for other reasons.  There is simply nothing from the 2001 time period suggesting that Swiss Re's actions were the reason for the discontinuance.  While attorney prepared declarations and recent deposition testimony suggests that Swiss Re's actions were the true reason, the Court need not consider this evidence in reaching its decision.  The Court must determine whether the damages Key alleges "naturally flow" from Swiss Re's actions.  As set forth

Key alleges that its decision to exit the business resulted from Swiss Re's bad faith refusal to pay claims under the policies.  Key seeks to recover $200 million in lost profits.  Swiss Re moves for summary judgment on the grounds that any damages Key may have incurred as a result of its exit from the auto leasing business were not proximately caused by Swiss Re. Specifically, Swiss Re claims that nothing it did caused Key to cease this line of its business. Rather, according to Swiss Re, the "overwhelming" evidence suggests that Meyer believed the dispute was with Reliance and further believed that only $40 million was disputed. Alternatively, Swiss Re argues that Key's voluntary decision to exit the business is an intervening cause.  According to Swiss Re, even if the Court rejects these arguments, Key cannot establish its lost profits to any degree of certainty.  Key argues that there is substantial evidence indicating that Meyer based his decision to exit the auto leasing business on the fact that Swiss Re had repudiated coverage.  In addition, Key argues that its discretionary act of exiting the business does not alter the proximate cause analysis.  In other words, Key claims that acts by the plaintiff do not absolve the wrongdoer from liability, provided the act was reasonably foreseeable.  Key further claims that expert testimony establishes the value of its lost business to a reasonable degree of certainty.  Each issue will be addressed in turn.

"A plaintiff may recover profits lost as a result of a defendant's tortious conduct if such damages may naturally be expected to follow from the wrongful act and if the damages are reasonably ascertainable."  *Henry v. City of Akron*, 501 N.E.2d 659, 663 (Oh. Ct. App. 9th Dist.

---

herein, the Court finds that regardless of whether Key's management considered Swiss Re's actions, the lost profits Key seeks do not "naturally flow" from Swiss Re's alleged bad faith.

43

1985).  "The recovery of lost profits for defendant's wrongful acts is not allowed unless the loss

is the immediate and not the remote consequence of the wrongful acts."  *Quick Air Freight, Inc.*

*v. Teamsters Local Union No. 413*, 575 N.E.2d 1204, 1215 (Ohio Ct. App. 10th Dist. 1989).  A

plaintiff, however, may not recover for losses that it reasonably could have prevented.  *Duracote*

*Corp. v. Goodyear Tire & Rubber, Co.*, 443 N.E.2d 184, 162 (Ohio 1983).[28]  Moreover,

"[p]rofits 'lost' from a completely voluntary and independent business decision are not 'caused'

in a legally cognizable sense by conduct that merely supplies some contributing factors

underlying the decision."  *Consolidated Data Terminals v. Applied Digital Data Systs.*, 708 F.2d

385 (4th Cir. 1983).

Upon review of all of the evidence and arguments presented, the Court finds that Key

may not recover from Swiss Re any lost profits incurred as a result of ceasing its auto leasing

operations.  As an initial matter, the Court agrees with Swiss Re that the losses at issue in this

case are *past* losses, that have no bearing on Key's ability to continue in the auto leasing

business  in the future.[29]  Swiss Re's policies did not cover any automobiles leased in the future.

---

[28]     Key claims that *Duracote* is not persuasive authority because it
involved lost profits under a breach of contract theory.  The Court
finds, however, that regardless of whether the claim is asserted in
contract or tort, a plaintiff should not be permitted to recover
losses it reasonably could have prevented.  Key cites no law
supporting a contrary position.

[29]     The Court disagrees with Key's attempt to distinguish Swiss Re's
cases on the grounds that, unlike those disputes, this dispute
involves a "breach that continued to cause losses for years into the
future, adversely affecting the plaintiff's ability to remain in the
business."  This is not a business in which gains or losses are
immediately recognized the year following the enrollment of the
vehicle.  While Key is correct that its losses continue into the
future, i.e., after the repudiation, it is not these years for which Key

44

Thus, Swiss Re and Key had no relationship on a going forward basis.  Key was free to select any residual value insurer and assume whatever level of risk it felt appropriate.[30]

Key does not dispute that the tangible economic effect of the dispute persisted regardless of whether Key remained in the auto leasing business.  Rather, Key's witnesses attempt to argue that shareholders would not approve of remaining in a market where a past insurer disputed claims and there was uncertainty about the ability to collect these unpaid amounts.   Based on the facts of this case, the Court finds that Key's decision to exit the market is, at best, a remote consequence of Swiss Re's alleged bad faith.  Key is one of in the largest financial institutions in the country with widely diversified interests.  It has a market capitalization of $15 billion.  It is simply not foreseeable that Key would entirely shut down a line of business based on an insurance dispute, which, at the time Key believed amounted to $40 million.[31]   Key would have

seeks lost profits.  Rather, Key would have incurred any gains or losses on future enrollments *following* the time period it would have sustained losses under the Swiss Re policies.  Thus, Key's attempt to distinguish Swiss Re's cases in untenable.

[30]   For example, assume Swiss Re had agreed to provide coverage for vehicles leased in 2005 and repudiated the policy.  Key ceased operations for the year 2005 because it could not secure coverage, then arguably Key could recover for Swiss Re's alleged bad faith.  It might be "reasonably foreseeable" that Key, left without coverage for future vehicles, would decide not to continue in auto leasing.

[31]   The Court agrees with Swiss Re that Meyer, the decisionmaker, unequivocally testified at his deposition that he did not believe that Swiss Re would continue to deny claims.  Specifically, he stated "at the time, quite obviously, I felt that 40 million dollars was all I needed to put away to resolve the issue...."  This testimony is also supported by the contemporaneous evidence, as well as the accounting treatment afforded the "disputed" and "undisputed" amounts.  The Court has reviewed Meyer's declaration and finds that his attempt to make "disputed" and "undisputed" one and the

45

the Court believe that, due to shareholder fear related to a past insurance dispute, its leaders

forwent $200 million in future profits.  In Key's brief addressing the "reasonableness" of its

damages estimate, Key introduces evidence that, at the time it made the decision to exit the

business, complete residual value insurance was available for a remarkably low premium.  In

addition, Key points out that its own internal business volume reports indicate that the market

was stabilizing and "substantial new business volume" could reasonably be expected.  In the face

of all of this evidence, Key asks this Court to believe that its management, apparently fearing

retribution from the stockholders for taking on such a profitable venture, decided to exit the auto

leasing business.  This proposition is simply untenable, given the nature of the dispute, as well as

Key's size and sophistication.  While Key may have considered the dispute in deciding to exit

the auto leasing business, profits lost from a "completely voluntary and independent business

decision are not 'caused' in a legally cognizable sense by conduct that merely supplies some

contributing factors underlying the decision."  *Id*.

Key cites *Queen City Terminals, Inc. v. General American Transportation Corp.*, 653

N.E.2d 661 (Ohio 1995) in support of its position.  In *Queen City*, defendant caused a benzene

leak at plaintiff's facility.  As a result of the spill, the City of Cincinnati revoked a permit that

had been issued to plaintiff for the purpose of handling benzene.  The court held that plaintiff

could recover economic damages from the tortfeasor incurred as a result of the city's decision to

revoke the permit.  According to Key, Meyer's decision to exit the auto leasing business is no

different than the City of Cincinnati's decision to revoke the plaintiff's permit.  This Court

_____

same is directly contradicted by his deposition testimony.
Accordingly, that portion of his declaration will not be considered
by the Court.

46

disagrees.  As Swiss Re points out, the plaintiff had no involvement in the city's decision to revoke the permit.  Here, however, not only did Key have involvement, it made an independent and conscious decision to exit the auto leasing business.  Again, given the specific facts of this case, the Court finds that no reasonable juror could conclude that Swiss Re's alleged bad faith could reasonably or foreseeably result in the lost profits Key claims it suffered.

The Court also concludes that Swiss Re is entitled to summary judgment with respect to Key's claim for lost profits on the grounds that Key fails to present sufficient evidence from which a jury could reasonably conclude the amount of lost profits Key suffered.  As damages, Key seeks to recover the value of its auto leasing business on the day Key ceased operations.  This type of analysis is known as the "discounted cash flow" method.  According to Key, this type of analysis is typically used in valuing businesses in the context of mergers and acquisitions and has been accepted by the Sixth Circuit as a reliable method for establishing damages.

Swiss Re argues that Key's method is faulty because it is based on two incorrect assumptions.  First, Key's expert assumes that complete residual value coverage was available in 2001 at the rate of 2.75%.  Swiss Re points out that the quote Key actually obtained was significantly higher–over 6% and did not afford complete coverage.  Swiss Re also points out that Key's expert did not research whether 2.75% was a reasonable prediction of the cost of insurance Key could have obtained.  Rather, the expert simply applied the 2.75% rate because Eckenrode, one of Key's other experts, told him such coverage was available.  In addition, Swiss Re claims that Key's analysis fails to consider whether rates would have remained static over time.  Swiss Re also argues that Key's expert failed to properly analyze the purported increase in business volume and whether inflation actually drives increases in volume.

47

In response, Key claims that its expert properly relied on the statement of Eckenrode that coverage was available at 2.75%.  Key further argues that Swiss Re obtained documents from Eckenrode indicating that complete coverage at the rate of 2.75% was actually available in 2001.  In addition, Key argues that it need not predict future insurance costs because the discounted cash flow method values a business as of a particular point in time, ignoring actual future results.  Key claims that its expert properly relied on Key's internal financial predictions regarding future business volume.  In addition, Key points out that the expert tested Key's projections with industry research.

Upon review, the Court finds that Key fails to introduce sufficient evidence from which a jury could calculate damages to a reasonable degree of certainty.  As Key itself points out, the discounted cash flow method is the value of a business as of a certain date.  Or, as Key's expert puts it, it is the "value to a particular investor based on individual investment requirements and expectations."   Thus, while events occurring after the date of valuation are not relevant to the analysis, *predictions* about future events are central to the analysis.  For this reason, Key's expert included a prediction about future business volume.  In his analysis, he concluded that business volume would initially remain constant and, over time, would steadily increase.[32]  Obviously, this belief about the future had the effect of increasing the value of Key's business.  A typical investor, of course, would also consider predicted future costs associated with the business.  For example, if insurance premiums were predicted to be exorbitant, the value of the business would be reduced accordingly.

_____

[32]     This projected increased was based, in part, on an inflationary factor.

48

Key's expert indicated that "based on discussions with Eckenrode," he "understood" that, in 2001, premiums ranged from 2.0% to 3.0%.  In addition, he knew that Key's captive insurer charged 2.75%.  Based on this information the expert concluded that "Direct Insurance Expense for [2002-2007] was projected at a premium rate of 2.75%...a midpoint between the [captive insurer] rate (2.5%) and the upper limit of rates at the time(3%)."  Key's expert, however, provides no analysis or factual basis for the apparent conclusion that the 2.75% rate would remain static for each year.  Given the factual record in this case, which indicates that the market fluctuated wildly over the preceding few years, the Court finds that the failure of Key's expert to *analyze* the likelihood of projected rate changes for the years 2002-2007 renders the analysis incomplete.   The expert utilized by Key for this analysis is an accountant and does not appear to have any special knowledge of residual value insurance.  Thus, the Court finds that his apparent conclusion that rates would remain the same is an insufficient basis on which the jury could place a value on this integral expense.

Key argues that the actual costs for the years 2002-2007 are not relevant to the analysis.  Assuming Key's argument is accurate, the projected costs for these years in 2001 are required in order for a jury to properly value the business under the discounted cash flow method.   Key itself projected the business volume into the future.  Certainly an investor analyzing the worth of Key's business would project costs into the future as well.  Having failed to analyze whether insurance premiums were projected to increase or decrease during the years 2002-2007, the Court finds that Key fails to present sufficient evidence from which a jury could reasonably conclude the amount of any loss.  For this additional reason, Key is not entitled to recover lost profits as a matter of law.

49

B.  Severance costs

Key seeks to recover severance costs associated with shutting down its auto leasing business.  For the reasons set forth above, the Court finds that Key is not entitled to recover severance costs associated with its decision to exit the auto leasing business.

C.      Expenses to RSA

In addition, Key seeks to recover costs incurred in outsourcing its end of lease functions to RSA.  Key does not dispute that end of term functions are typically the responsibility of the insured, even where residual value coverage exists.  Key claims that it determined that its in-house team could not obtain results as good as RSA.  According to Key, faced with massive losses it decided to incur the additional expense of hiring a "top outside firm" to assist with remarketing vehicles coming off lease.  At first, Key tested RSA's abilities by permitting it to remarket 50% of its vehicles.  In 2003, Key moved all of its vehicles to RSA for remarketing. Key's primary witness on the subject testified that Key decided to utilize RSA in order to "mitigate losses" on a going forward basis.  Key is seeking to recover the entirety of the expenses it paid to RSA

Swiss Re argues that Key's decision to use RSA is not the result of Swiss Re's alleged bad faith.  In addition, Swiss Re claims that Key cannot reasonably calculate its damages. According to Swiss Re, Key would have borne some of the cost of remarketing the vehicles regardless of Swiss Re's alleged bad faith.  In addition, Swiss Re points out that Key employees testified that an additional 20-40 employees would have been required if Key remarketed its vehicles in-house.  In addition, an internal document prepared by Key identifies "Key Auto Finance" expense avoidance costs for the years 2001 and 2002.  Key, however, fails to account

50

for any of this in its damages analysis.  As such, Swiss Re claims that Key cannot reasonably calculate its damages.  Key disputes both contentions.

Upon review, the Court finds that Swiss Re is entitled to summary judgment because Key fails to introduce evidence of the difference between the cost it incurred in utilizing RSA and the costs it would have incurred absent Swiss Re's alleged bad faith.  Key does not dispute that its own expert testified that costs of remarketing are typically borne by the insured.  Key, however, claims that this proposition only applies in a "functioning, good-faith insurance relationship." Thus, absent Swiss Re's bad faith, Key admits it would have incurred expenses in remarketing its vehicles.  Key, however seeks to recover *all* expenses associated with remarketing the vehicles.  While arguably Key may be permitted to recover the additional amount of costs it incurred,[33] Key is not permitted to recover a windfall.  Key's attempt to shift costs it would naturally have incurred to Swiss Re is rejected.

Key fails to introduce any evidence from which the costs of its in-house remarketing could be determined.  Key argues that Swiss Re must be blamed for any uncertainty associated with its damages calculation.[34]  The Court seriously doubts that such a calculation is so uncertain that no evidence could exist to support an analysis.  This is especially so given that for a period

---

[33]     The Court draws no conclusion with regard to causation.

[34]     Key points to a "EOT Outsource Summary" which Key claims demonstrates that Key paid RSA approximately $1.5 million more each year than the anticipated external expenses.  Swiss Re points to this document as support for the proposition that utilizing RSA actually saved Key money.  Key itself claims that "no conclusion about cost savings can be inferred from these projections." Accordingly, the Court finds that this document is not evidence sufficient from which a jury could analyze any offset.

of time, both Key's in-house department and RSA were simultaneously performing this function. Regardless, the Court finds that Key may not recover the additional costs associated with utilizing the services of RSA because Key fails to introduce evidence sufficient to reasonably calculate its damages.

   D.  Capital allocations

   In 2003, Key's management determined that additional capital must be allocated to Key's auto leasing business in order to compensate for the risk that losses under the policies may not be covered.  Key moved approximately $30 million in capital from its capital reserve account into the auto leasing line's capital reserve account.

   Swiss Re argues that Key is not entitled to recover damages associated with the increase in capital allocation to Key's auto leasing unit.  Swiss Re claims that Key cannot establish that any alleged loss was proximately caused by Swiss Re's bad faith.  According to Swiss Re, an increase in capital allocation was not necessary because no "loss" payment was due in 2003. Swiss Re also claims that Key did not suffer an actual "loss" as a result of the capital allocation. Key responds that the timing of payment is irrelevant because the capital increase was required due to the risk of nonpayment faced by Key.  In addition, Key points out that its expert testified that the cost of capital allocation is 11.5%.  Accordingly, Key argues that it established its damages to a reasonable degree of certainty.

   Upon review, the Court finds that Swiss Re is entitled to summary judgment.  Key fails to present any evidence that it suffered an actual loss.  As Swiss Re points out, there is no evidence that Key was required to raise additional capital in order to account for the additional capital allocation made to auto leasing.  Nor is there evidence that Key "replenished" its capital

reserve account, from which the capital allocation was made.  While Key's expert testifies that the cost of capital is 11.5%, it is apparent from his report that this is the cost of *all* of Key's capital, regardless of where it is allocated.  In that there is no evidence that any additional capital was required at this cost, Key suffered no damage.[35]

### E.    Negative spread loans

In order to entice lessees to purchase their vehicles, Key offered below-market loans referred to as "negative spread loans."  Swiss Re alleges that Key cannot recover losses incurred on these loans because Swiss Re's repudiation of coverage was not the "proximate cause" of the loss.  Rather, according to Swiss Re, Key maintained a practice of issuing negative spread loans *before* the point in time Swiss Re allegedly repudiated coverage.  In addition, Swiss Re points out that Key issued negative spread loans for its captive insurer, KICL.  Thus, Swiss Re claims no reasonable juror could conclude that Key's losses were caused by Swiss Re.

In response, Key points out that only a handful of loans were issued prior to the time Swiss Re repudiated coverage.  Key further argues that it issued negative spread loans with regard to its captive insurer in order to reduce its own losses.  Key points to the testimony of various employees all of whom testified that Key issued negative spread loans in order to mitigate its losses.

Upon review of the evidence presented, the Court finds that reasonable minds could differ as to whether damages associated with the issuance of negative spread loans were proximately caused by Swiss Re's bad faith.  The evidence clearly demonstrates that at least

---

[35]    At best Key's "capital allocation" loss is a type of "hypothetical loss" for which recovery will not be permitted.

some loans were issued prior to Swiss Re's repudiation. On the other hand, Key's witnesses testified that the use of negative spread loans was the result of Swiss Re's denial of coverage. In addition, Key points out that the frequency of the issuance of negative spread loans increased during 2001 and rates for these loans were further reduced. While the Court finds that Key is not permitted to recover for losses incurred on the issuance of negative spread loans predating Swiss Re's bad faith, reasonable minds could differ as to whether the continued and increased use of negative spread loans was caused by Swiss Re's actions. Accordingly, summary judgment is not appropriate.[36]

IV.     Void for fraud defense

Swiss Re asserted that the policies at issue in this case are void due to Key's alleged fraud in the submission of claims. Key moves the Court for summary judgment in its favor on this affirmative defense. Swiss Re opposes the motion.

The policies at issue in this case each contain a provision similar to the following,

CONCEALMENT, MISREPRESENTATION OR FRAUD: This policy is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by the "Named Insured" or any other insured, at anytime, concerning:

1.      This policy;

2.      The covered property;

3.      The "Named Insured's" interest in the covered property; or

---

[36]     Swiss Re argues in its opening brief that Key actually saved money by issuing negative spread loans because it did not incur auction fees. Key, however, points out in its opposition brief that Key essentially charged its lessees for these fees through a "disposition fee." Swiss Re does not address Key's evidence in its reply brief. Accordingly, the Court finds that, in the face of Key's evidence, Swiss Re is not entitled to summary judgment.

4.      A claim under this policy.

According to Swiss Re, Key submitted intentionally overstated claims for payment.

Swiss Re claims that Key knew of the overstatement and failed to inform Swiss Re.  In support

of its position, Swiss Re points to the following evidence,

1.      In November of 2000, Key amended its claims adjusting procedure and sought coverage for residual values in excess of those set forth in Key's Custom Guides by ceasing to engage in a "Custom Guide residual review;"

2.      Key knew this practice overestimated losses;

3.      In a March 2004 internal email, Key indicated that it stopped the Custom Guide Review because it was too time consuming;

4.      The author of the March 2004 email was deposed in October of 2004, yet denied knowledge of why the process was changed;

5.      In 2003, Key decided to continue submitting overstated claims, while at the same time commencing a year-long project to recalculate the claims;

6.      In a 2003 email, Key admitted that, without using the Custom Guide Review, all claims will be wrong, yet continued to submit them to Swiss Re;

7.      Key failed to inform either Swiss Re or the Court that it was in the process of revising its claims in 2003 in order to present a complete replacement set of claims;

8.      Key's revised 2004 chart shows that 33% of claims were reduced;

9.      Key submitted claims for leases extended beyond 180 days, even though these vehicles are not covered by the policies.  Nearly 1000 claims were submitted between 2000 and 2002.  Key continued to submit these claims in 2003, even after reconsidering its claims submission process;

10.     In 2003 and 2004, Key submitted claims under the NAS policy for leases extended five months.  A Key employee testified that these claims were submitted as if there had only been a four month extension even though the policy precluded any claim for leases extended five months.  Key changed its litigation position on coverage only after Swiss Re pointed out these "false" claims;

11.     Key informed the Court hat none of the senior executives were made aware of the details of the revision of Key's loss reports.  This statement was based on the

55

interrogatory response of Richard Vonk.  Contrary to this statement, Stevens testified that he had several conversations with Vonk concerning the status of corrected claims and knew that the errors "involved several million dollars;"

12.    In light of Stevens' testimony, Vonk admitted that his interrogatory response was inaccurate;

13.    Key concealed the fact that it was revising its loss claims chart.  In addition, Key submitted two revisions to the chart without informing Swiss Re that changes would be forthcoming.  As a result, Swiss Re expended a substantial amount of money investigating claims Key knew were false.

Key moves for summary judgment on the grounds that Swiss Re cannot use the "void for fraud" provision to escape liability because Swiss Re repudiated the policies.  According to Key, well settled law precludes an insurer from using post-repudiation conduct in order to establish fraud.   Key also argues that Swiss Re never investigated or reviewed the claims.  As such, any alleged fraud was not "material."  In addition, Key claims that Swiss Re cannot rely on this provision because it failed to tender back Key's premiums.  Key further claims that no reasonable juror could find that Key intended to deceive Swiss Re.  Swiss Re argues that the evidence shows that Key misrepresented and concealed facts regarding the amount of its claims.  Swiss Re further argues that the representations were both intentional and material.  Swiss Re also claims that the doctrine of anticipatory repudiation does not afford Key with immunity from the "void for fraud" provision.   In any event, Swiss Re claims that Key's fraud pre-dated Swiss Re's repudiation.  Swiss Re further claims that the law does not require that it give back the premiums before asserting its defense.

As an initial matter, the Court agrees with Key that, as a matter of law, any alleged fraudulent conduct occurring after Swiss Re repudiated the policy and Key filed this lawsuit cannot form the basis of Swiss Re's fraud claim.  The Court finds that an Ohio court would apply

the majority rule announced in *American Paint Service, Inv. v. Home Ins. Co. of New York*, 246 F.2d 91 (3rd Cir. 1957).  In *American Paint*, the insurer denied coverage for business interruption insurance on the grounds that the insured intentionally caused the fire that resulted in the loss.  The insurer denied coverage and also claimed that the insured violated the "void for fraud" provision in the policy.  The trial court permitted the jury to consider allegedly false statements made by the insured at trial in evaluating whether the void for fraud provision was breached.  The Third Circuit reversed the trial court's decision and held,

> The [fraud and] false swearing referred to is such as may be in the submission of preliminary proofs of loss, or in the examination to which the assured agreed to submit....
>
> ***
>
> The fraud and false searing clause is one beneficial to the insurer and it reasonably extends to protect the insurer during the period of settlement and adjustment of the claim. When settlement fails and suit is filed, the parties no longer deal on the non-adversary level required by the fraud and false swearing clause.  If the insurer denies liability and compels the insured to bring suit, the rights of the parties are fixed as of that time for it is assumed that the insurer, in good faith, then has sound reasons based upon the terms of the policy for denying the claim of the insured.  To permit the insurer to await the testimony at trial to create a further ground to escape from its contractual obligation is inconsistent with the function the trial normally serves.  It is at the trial that the insurer must display, not manufacture, its case.  Certainly the courts do not condone perjury by an insured, and appropriate criminal action against such a perjurer is always available.

*Id*. at 94; *See also, Ichthys, Inc. v. Guarantee Ins. Co.*, 249 Cal.App.2d 555 (1967)(trial testimony may not support a void for fraud defense).

Since *American Paint*, courts routinely preclude insurers from relying on, not only trial testimony, but also pre-trial litigation conduct in support of a void for fraud defense.  For example, in *Ocean-Clear, Inc. v. Continental Casualty Co.*, 94 A.D.2d 717 (N.Y. App. Div. 1983), the insured sought coverage on two fire policies, claiming that a faulty motor caused damage to its premises.  The insurer sought to introduce evidence that the insured fraudulently

provided a motor for inspection during discovery that it knew was not involved in the fire.  The

court precluded the insurer from relying on the alleged fraud that occurred during discovery.

Specifically, the court held,

> Ordinarily, an insurer may assert as an affirmative defense the breach of the standard
> willful concealment or misrepresentation clause by its assured.  Once an insurer
> repudiates liability, however, the assured is excused from any of its obligations under the
> policy, and therefore it is generally accepted that fraud arising after the commencement
> of an action on a policy does not void the policy.

*Id*. at 718.  *See also*, *Dodson Aviation, Inc. v. Rollins, Burdick, Hunter of Kansas, Inc.*, 807 P.2d

1319 (Kan. Ct. App. 1991) ("[t]he overwhelming majority of jurisdictions hold that only false

statement made before legal proceedings have begun can serve to void an insurance policy");

*Rego v. Connecticut Ins. Placement Facility*, 593 A.2d 491 (Conn. 1991)("defendant cannot rely

on any alleged misrepresentations made after it denied coverage");  *Jonari Mgmt. Corp. v. St.

Paul Fire & Marine Ins. Co.*, 87 A.D.2d 540 (N.Y. App. Div. 1982)("[s]tatements made by the

insured during pretrial and trial proceedings are not relevant to the insurer's defense of fraud and

false swearing").

Contrary to the majority rule, Swiss Re relies primarily on *Thomas v. New Jersey Ins.

Underwriting Ass'n*, 649 A.2d 1383 (N.J. Super. 1994) in support of its position that post-suit

conduct can form the basis of its void for fraud defense.  In *Thomas*, the court rejected a "bright

line" rule that post-litigation conduct can never form the basis of a void for fraud defense.

Rather, in essence the court concluded that the timing of the allegedly fraudulent conduct will

affect the materiality element of the defense.[37]  For example, the earlier the statement is made,

---

[37]     The insurance agreement, like the one at issue here, contained a
         "materiality" provision.

the more likely it is "material."  Thus, *Thomas* reasoned that it would highly unlikely that conduct occurring at trial could ever be considered "material."  In addition, the court indicated that "materiality" is only satisfied if "the false statement concerns a subject relevant and germane to [the insurer's] investigation as it was then proceeding."  *Id*. at 1388.

Upon review, the Court finds that an Ohio court would adopt the majority rule if faced with this issue.  The Court disagrees with the reasoning of the *Thomas* court, primarily because it overlooks the fact that the "void for fraud" provision arises by *contract*, not common law.  The *Thomas* court attempted to distinguish its holding from *American Paint* on the grounds that, while the contract may have been repudiated, coverage could in fact be reinstated at some later point in time.  In essence, *Thomas* stands for the proposition that the insurer/insured relationship survives the filing of a lawsuit.  This Court disagrees.  While litigants are under a common law duty not to engage in fraud during the course of litigation, the denial of coverage and the filing of a lawsuit relieves the insured's *contractual* duty to avoid fraudulent conduct.

On the other hand, the reasoning of *American Paint* and its progeny more accurately depicts the nature of the fraud clause.  In essence, these cases hold that once an insurer repudiates coverage, the insurer cannot rely on post-repudiation conduct in order to establish a defense to coverage because the insured is *excused* from the coverage condition.  Ohio courts are in accord with regard to other contractual conditions.  For example, Ohio courts excuse an insured from compliance with a provision requiring the insurer's approval prior to settlement where the insurer repudiated coverage.  *See, e.g.*, *Travelers Ins. Co. v. Motorists Mut. Ins. Co.*, 178 N.E.2d 613, 618 (Ohio Ct. App. 1961)(an insured cannot breach its contract by refusing to defend action and at the same time rely on enforcement of policy provision requiring approval

59

before settlement).   The Court finds no real distinction between these two types of coverage conditions.

The Court further agrees with the reasoning of *American Paint* that the purpose of fraud clauses is not fulfilled if post-litigation conduct is considered because, by this point in time, the parties are "no longer in the period of settlement and adjustment."  This case provides the perfect example.  Swiss Re's primary complaint lies with Key's submission and repeated amendments of its loss runs.  Swiss Re does not dispute, however, that these loss reports were immediately forwarded to outside counsel for review.  Swiss Re admits that it did not adjust any of Key's claims other than under the guise of damages discovery.  Thus, Swiss Re, as Key's insurer, did not adjust these claims.  Rather, Swiss Re's experts and attorneys analyzed these claims.  It is commonly understood, however, that in the context of litigation, each party seeks to present damages in the light most favorable to its respective position.  The Court finds that Key and Swiss Re are not acting as insured and insurer, but rather as plaintiff and defendant.  Thus, the rationale for the void for fraud clause no longer applies.

The Court is careful to note that its holding in no way prevents a party from seeking traditional remedies for any alleged fraud committed in the course of litigation.  The legal system has numerous remedies at its disposal to discourage and prevent fraudulent conduct.  Where, however, an insurer expressly disavows contractual provisions that work to its detriment, it cannot at the same time seek enforcement of the provisions that work in its favor.

Swiss Re argues that this case differs from *American Paint* and its progeny because losses were incurred throughout litigation, as opposed to one single loss occurring prior to the commencement of litigation.  The Court finds this to be a distinction without a difference.

60

Swiss Re admittedly treated the loss reports, not for purposes of evaluating coverage, but rather as damages discovery.  Swiss Re's denial of coverage stemmed from its position that none of the policies are enforceable.  Swiss Re's disavowal of all coverage prompted Key to file this lawsuit. By disclaiming the policies, Swiss Re also disclaimed the right to rely on enforcement of future conditions contained in those policies.  Thus, the Court finds that Swiss Re's argument must be rejected.

Swiss Re also argues that, upon its alleged repudiation, Key had the option of either rescinding the policies or continuing performance.  Because Key chose to continue performing, it must abide by the terms of the policies.  Key claims that Swiss Re's breach was not an anticipatory repudiation because its obligation to perform was triggered by Reliance's downgrading.  Thus, according to Key, immediate performance was due.  Key argues that because Swiss Re's breach was immediate, the "choice" required under the doctrine of anticipatory repudiation does not arise.

Upon review, the Court finds that Swiss Re's argument must be rejected.  As the Sixth Circuit recently recognized, insurance contracts are unilateral in nature.  *See, Combs v. International Ins. Co.*, 354 F.3d 568 (6th Cir. 2004).  A unilateral contract, by definition, is one in which only one party promises to perform.  A bilateral contract, on the other hand, is one in which there are mutual promises between two parties to the contract.   In this case, Key made no promise to perform.  Rather, Key paid its premiums in exchange for Swiss Re's promise to pay claims in the event of a loss.  Thus, the Court finds that the polices constitute unilateral contracts.

The doctrine of anticipatory repudiation permits a party to assert a claim for breach of

contract before the actual breach occurs.  Due to the distinction between unilateral and bilateral contracts, courts disagreed on whether the doctrine of anticipatory repudiation applies to unilateral contracts.  Because the party asserting anticipatory repudiation already completed performance, it was not clear whether there was any legal benefit to permitting the party awaiting performance to bring suit before the performance was due.  The Sixth Circuit, however, has expressly held that a party to a unilateral contract, who is awaiting performance from the promisor, is permitted to assert a claim for anticipatory repudiation.  *Id*. at 599-600. Thus, a party to a unilateral contract may bring suit immediately upon the anticipatory breach.

It is also well settled that the parties to a bilateral contract must make the "election" urged by Swiss Re in order to assert a claim for anticipatory repudiation.  As set forth above, a bilateral contract consists of an exchange of promises.  If one party fails to perform as promised, the other party to the contract can either treat the contract as terminated or perform.  Although the Sixth Circuit concluded that anticipatory repudiation applies to a unilateral contract, it did not address whether the "election of remedies" requirement applicable to bilateral contracts also applies to unilateral contracts.  This Court finds that, an Ohio court, if faced with this issue, would conclude that it does not.  Simply put, there is no election to be made.  Performance of a unilateral contract, by definition, is complete.  Thus, it would be impossible for Key to have "continued" performance.[38]  As a result, Swiss Re's argument that Key's "continued

---

[38]     Key's performance was complete as of the time the lawsuit was filed.  There was no performance due Swiss Re because all premiums had been paid.  While Key continued to submit loss reports, the submission of loss reports is not equivalent to performance under the contract.  *See e.g., Winters v. State Farm & Cas. Co.*, 35 F.Supp.2d 842, 845 (E.D.Okla. 1999)(cited with approval in *Combs*, 354 F.3d at n.17)(distinguishing between

performance" prevents it from relying on anticipatory repudiation is rejected.

For the foregoing reasons, the Court finds that Swiss Re may not assert its void for fraud defense for loss reports submitted after the filing of this lawsuit.[39]  Swiss Re, however, argues that Key engaged in fraudulent conduct sufficient to void the policies *before* litigation ensued. Swiss Re claims that, in early 2000, Key audited its loss reports to verify that its losses did not exceed the residual values set forth in Key's guidebooks.  Swiss Re claims that Key admitted that it ceased this review in sometime in the fall (possibly November) of 2000 because the review was too time consuming.  In addition, Swiss Re points to testimony from Key witnesses indicating that Key knew that stopping the review would result in "wrong" claims in some cases. Swiss Re also points out that, as a practice, Key sought coverage for overextended leases.  In response, Key claims that this evidence is insufficient to establish that Key engaged in any activity that would void the policy.  According to Key, assuming *arguendo* the accuracy of Swiss Re's allegations, Swiss Re nonetheless fails to demonstrate that any particular claim submitted prior to the commencement of litigation was "wrong."

Upon review, the Court agrees with Key.  There is simply no evidence that any particular claim submitted in 2000 was the product of "fraud, intentional concealment or misrepresentation of a material fact.[40]"  The parties in this case engaged in extensive damages discovery and employed numerous experts to analyze and reanalyze the claims submitted.  Yet, Swiss Re fails

---

conditions and performance).

[39]  The Court need not reach Key's argument that Swiss Re's failure to tender back premiums also precludes Swiss Re from relying on the "void for fraud" clause.

[40]  This lawsuit was filed in January of 2001.

to point to any particular claim that Key allegedly overstated during this time period. Key ceased its residual value review late in the fall of 2000, just months before this lawsuit was filed. Thus, the period under review is very short. Absent evidence from Swiss Re as to the number of allegedly overstated claims or the amount of the overstatement during this time period, the Court finds that no reasonable juror could conclude that Key either engaged in fraud or concealed or misrepresented a "material" fact.[41] In addition, there is no evidence even suggesting that Key sought coverage for an overextended lease prior to litigation. Thus, Key is entitled to summary judgment on Swiss Re's "void for fraud" affirmative defense.

V.      Failure to mitigate

Key moves for summary judgment on Swiss Re's affirmative defense of failure to mitigate. Swiss Re claims that Key failed to mitigate Swiss Re's damages by selling off-lease vehicles at auction. According to Swiss Re, Key routinely obtained sales prices considerably lower than average.

During discovery, Key propounded interrogatories to Swiss Re requesting all bases supporting Swiss Re's defense, as well as an estimate of the losses. In response, Swiss Re

---

[41]      Swiss Re asks this Court to grant a "negative inference" in its favor due to Key's alleged spoliation of evidence. Specifically, Swiss Re asks the Court to infer that "Key knew and intended that its decision to discontinue the Custom Guide Review in November 2000 would lead to the presentation of overstated claims." Separately, Swiss Re filed a motion for sanctions due to Key's deletion of emails. The Court struck that motion for failure to comply with the local rules. Even assuming Swiss Re were entitled to the negative inference, however, the Court finds that Key is nonetheless entitled to summary judgment. Even with the inference, there is no evidence that any particular claim during the short time period before the lawsuit was filed was overstated.

64

indicated that it would provide its expert report in lieu of preparing a written response. Subsequently, Swiss Re provided the report of Robert Wagner, who essentially opined that Key could have obtained better results at auction.  In its motion, Key points out that it appears Wagner lied during his deposition.  In response, Swiss Re wrote the Court indicating its intent to withdraw Wagner as an expert.  The Court accepts Swiss Re's withdrawal and, as such, Swiss Re has no expert evidence supporting its affirmative defense.

In support of its claim, Swiss Re points to evidence from Key and RSA employees suggesting that Key did not obtain good results from its auction sales.  Swiss Re further claims that Key admits the Black Book Wholesale Average is an industry benchmark.  Swiss Re goes on to point out that Key routinely obtained less than BBWA at auction.  According to Swiss Re, this evidence is sufficient to avoid summary judgment.  On the other hand, Key argues that expert testimony is necessary to resolve this issue.  Key claims that this is a complicated analysis and no juror could make any determination as to the reasonableness of Key's mitigation efforts at auction absent such testimony.

Upon review, the Court agrees with Key.  Swiss Re admits that in order to succeed on its affirmative defense, the jury must be presented with evidence from which it could conclude that Key's activities at auction were not reasonable.  The Court finds that this analysis requires highly specialized knowledge, including such things as the industry standard for selling cars at auction, the types of activities involved in auction sales and the selling price of Key's vehicles versus the selling price of comparable vehicles.  Swiss Re points out that Key measured its auction sales as a percentage of BBWA.  According to Swiss Re, Key obtained less than 100% of BBWA  for certain time periods.  Simply pointing out that Key did not obtain BBWA, without

65

more, is an insufficient basis on which a jury could conclude that Key failed to mitigate

damages.  As Key points out, there is no evidence that any particular percentage of BBWA is

commercially unreasonable.  It appears that Swiss Re is claiming that only a 100% or more

average of BBWA is commercially reasonable.  Swiss Re, however, has no *evidence* supporting

this fact.  Because Swiss Re fails to introduce any expert testimony evidencing any standard to

be applied to Key's auction efforts, the Court finds that Key is entitled to summary judgment on

Swiss Re's affirmative defense of failure to mitigate.[42]

VI.     Authority/Promissory estoppel

        During the liability phase of this case, this Court concluded that a question of fact exists

as to whether Tri-Arc had actual authority to issue the 4019 Policy and the REINS-1

Endorsement on behalf of Swiss Re.  Swiss Re moves for summary judgment on the grounds that

newly discovered evidence conclusively demonstrates that Tri-Arc did not have the authority to

issue the 4019 Policy or the REINS-1 Endorsement.  This Court finds that Swiss Re's motion on

these issues is untimely.  The Court is greatly troubled at Swiss Re's intentional disregard for

this Court's order.  Swiss Re moved for leave to re-depose Tri-Arc with regard to liability issues

after Tri-Arc admitted it acted as Swiss Re's agent.  The Court denied Swiss Re's request, citing

---

[42]     In its response brief, Swiss Re claims that regardless of whether
         the Court grants summary judgment on its affirmative defense,
         Key must nonetheless establish that it marketed the vehicles in a
         commercially reasonable manner.  According to Swiss Re, the
         policies implicitly require Key to remarket its vehicles in "good
         faith."  As such, Key bears the burden of establishing that it
         remarketed its vehicles in a reasonable manner.  This Court
         disagrees.  The Court finds Swiss Re's argument to be an
         impermissible attempt to shift the burden of establishing what is
         clearly an affirmative defense onto Key.

66

specific reasons for the ruling.  Apparently, Swiss Re does not feel constrained by this Court's orders and redeposed Tri-Arc on liability issues during damages discovery without seeking leave.  Swiss Re argues that it did so as a matter of "convenience."  The Court is greatly troubled by Swiss Re's actions and will not reward Swiss Re's conduct by reconsidering liability issues based on Swiss Re's "newly discovered" evidence.

**CONCLUSION**

For the foregoing reasons, Key's motion is GRANTED in PART and DENIED in PART. Swiss Re's motion is also GRANTED in PART and DENIED in PART.  Given the length of this opinion and the highly contentious nature of this litigation, the Court asks counsel to resist the urge to file motions for reconsideration simply for purposes of rearguing the issues presented.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 9/29/06